## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | No. 5:18-cr-00558 |
| | : | |
| MIGUEL GONZALEZ SEGOVIA | : | |

## O P I N I O N

**Defendants' Pretrial Motion to Suppress, ECF No. 18—Denied**

**Joseph F. Leeson, Jr.**                                                    **August 2, 2019**
**United States District Judge**

## I.     INTRODUCTION

The government charged Defendant Miguel Gonzalez Segovia with one count of

possession with intent to distribute five kilograms or more of cocaine and 400 grams or more of

fentanyl in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and aiding and abetting in violation of

18 U.S.C. § 2. In preparation for trial, Defendant filed a motion to suppress any and all evidence

obtained by the government or statements he made during the traffic stop on November 13,

2018, arguing that the statements were obtained in violation of his rights under the Fourth and

Fifth Amendments. Defendant moves to suppress on four grounds: (1) he claims that

Pennsylvania State Police Trooper John Stepanski lacked reasonable suspicion to stop him for a

motor vehicle violation; (2) he argues that Trooper Stepanski had no reasonable suspicion to

continue to detain and question Defendant after the initial stop; (3) he argues that his *Miranda*[1]

---

[1]     *Miranda v. Arizona*, 384 U.S. 436 (1966).

rights were violated by his interaction with Trooper Stepanski; and (4) he argues that the consent

he gave to search his vehicle is invalid.[2]

The Court heard testimony and received evidence during a hearing on the motion on May

15, 2019.[3] The defendant did not testify. For the reasons set forth below,[4] the motion to suppress

is denied.

## II.    FINDINGS OF FACT[5]

1.      John Stepanski has been a Trooper with the Pennsylvania State Police (PSP) since

2009. *See* Suppression Hearing Transcript 17, ECF No. 28. In that time, he was assigned

---

[2]      During the suppression hearing and in his Draft Findings of Fact and Conclusions of
Law, Defendant also argues that Trooper Stepanski took into consideration Defendant's race in
making the determination to stop the vehicle. Def.'s Draft Find. Fact & Concl. Law 16, ECF No.
29 [hereinafter Def.'s Br.]. Defendant further argues that Trooper Stepanski's justification for
originally following Defendant's vehicle "was nothing more than a cheap attempt to cover up an
undeniably pretextual stop of a Hispanic man." Def.'s Br. 17. The Court also considers these
arguments below.

[3]      The United States Supreme Court has noted that the interests at stake in a suppression
hearing are of a lesser magnitude than those in the criminal trial itself. *United States v. Raddatz*,
447 U.S. 667, 679 (1980); *see also United States v. Robinson*, 663 F. App'x 215, 218 (3d Cir.
2016). As such, "[a]t a suppression hearing, the court may rely on hearsay and other evidence,
even though that evidence would not be admissible at trial." *Robinson*, 663 F. App'x at 218.

[4]      *See* Fed. R. Crim. P. 12(d) (directing that "the court must state its essential findings on
the record").

[5]      At the hearing, the Court heard the testimony of Pennsylvania State Police (PSP) Trooper
John Stepanski. Although Trooper Stepanski's testimony was challenged, and at points he was
guarded in his responses or was evasive, he had a good recollection of the relevant events and his
testimony was consistent. Therefore, he Court finds his testimony credible and accepts it as fact.

At the hearing the parties also stipulated to the following items (in chronological order):
(1) the authenticity of the video and audio of Defendant's traffic stop captured by PSP Trooper
Stepanski's patrol vehicle (Tr. 15-17, 33, 39, 41, 43-44)—Gov't Ex. 2; (2) the photographs taken
as a result of Trooper Stepanski's search and seizure are true and accurate photographs taken in
and around the time of the seizure (Tr. 15-16)—Gov't Exs. 9-22; (3) the authenticity of the video
and audio of Trooper Stepanski giving Defendant the *Miranda* warnings and Defendant then
agreeing to speak with Trooper Stepanski (Tr. 39)—Gov't Ex. 2; (4) that the drugs seized as a
result of Trooper Stepanski's search and seizure were sent to the Drug Enforcement
Administration's drug laboratory in Northeast New York and the laboratory determined that

primarily to patrol units and also was assigned to the Canine Unit for several months. Tr. 17, Gov't Ex. 1 (Stepanski Résumé).

2.      During his time with the PSP, Trooper Stepanski received specialized training in subjects related to his duties as a patrol officer. Tr. 18-19, 49, Gov't Ex. 1. He has attended hundreds of hours of drug trafficking-related enforcement and interdiction training. Tr. 18-19, Gov't Ex. 1. This training included the PSP's Safe Highway Initiative through Effective Law Enforcement Detection ("SHIELD") training, which teaches troopers to identify drug trafficking as it relates to car stops and highway interdiction. Tr. 18. Trooper Stepanski described it in his testimony as the "A to Z on what you're looking for on the road for interdiction as far as traffic stops and furthering the investigation." Tr. 18. In addition to that training, Trooper Stepanski also attended a weeklong National Interdiction Conference in 2017 where he was informed of nationwide trends in interdiction and learned from top drug interdiction officers other techniques they use and indicators for which they look. Tr. 18.

3.      Since September 2016, Trooper Stepanski has been assigned to the Patrol Unit. Gov't Ex. 1. As a patrol officer doing interdiction work, there are three types of traffic stops he conducts: (1) stops for minor traffic infractions that result in a verbal warning, a written warning, or a traffic ticket; (2) stops that lead to the direct arrest of a person because there is probable

_____

there were 69 kilograms of cocaine, 14 kilograms of fentanyl, and 3.9 kilograms of acetylfentanyl seized (Tr. 47); (5) that Trooper Stepanski's Incident Report, Part II, is a true and accurate report (Tr. 122)—Def. Ex. 5; (6) that Pennsylvania State Police responded appropriately to Defendant's subpoena requesting the production of certain reports and citations issued by Trooper Stepanski (Tr. 156)—Def. Ex. 4; (7) the admission of other reports and citations issued by Trooper Stepanski produced in response to Defendant's subpoena that were not included in Defense Exhibit 4 (Tr. 171)—Gov't Ex. 27; (8) the testimony of Trooper Javier Garcia had he been called to testify (Tr. 175); and (9) for the purposes of argument on the motion to suppress, certain data produced by the United States Census Bureau (Tr. 177-78)—Def. Ex. 6.

cause to effect the arrest immediately (*e.g.*, contraband in plain view or the motorist is a fugitive); and (3) stops where, after having reasonable suspicion to make the stop, during the course of routine questioning of the motorist he develops reasonable suspicion that criminal activity is afoot. Tr. 20. In the third category of traffic stops, after developing reasonable suspicion, Trooper Stepanski will either request consent to search the vehicle or, if consent is denied, take other investigatory steps consistent with the law. Tr. 21.

4.      Trooper Stepanski was working in that capacity as a patrol officer on November 13, 2018, patrolling Interstate 78 in Northampton County, in the Eastern District of Pennsylvania. Tr. 21. The stretch of Interstate 78 he was patrolling is well known as a drug corridor. Tr. 19-20.

5.      On that day, while in a marked patrol vehicle parked in the center median of the interstate, Trooper Stepanski observed a black Ford Expedition bearing Ohio registration traveling eastbound as it approached his location. Tr. 21-23.

6.      The driver of the vehicle, later identified as Defendant Miguel Gonzalez Segovia, shifted his body in a way that caught Trooper Stepanski's attention. Tr. 22. Trooper Stepanski pulled out of the median to follow Defendant's vehicle. Tr. 23, Gov't Ex. 2 (dash camera video and audio of the traffic stop).[6]

---

[6]      At the hearing, the Court admitted two exhibits regarding the video and audio of the traffic stop: (1) a CD-ROM containing video and audio of the traffic stop filmed from Trooper Stepanski's dashboard camera, *see* Gov't Ex. 2, and (2) a transcript of the video and audio of the same traffic stop produced by defense counsel, *see* Def. Ex. 6. Tr. 15-17. Counsel for the parties disagreed over the treatment of the transcript. Tr. 16-17. In making its findings of fact, the Court used the transcript as an aid. Where there were discrepancies between the transcript and video and audio of the traffic stop, the Court relied only on the video and audio.

7.      Typically, the glare from the sun off of a vehicle's windows or windshield would prevent observation of the motorist. Tr. 71. Trooper Stepanski was able to observe Defendant shift his body, however, because the weather was "kind of gloomy out," and he could see into the vehicle quite well. Tr. 71.

8.      Trooper Stepanski testified that he could not see that the defendant was Hispanic as he drove by. Tr. 74.

9.      After catching up with Defendant's vehicle, Trooper Stepanski clocked the vehicle for 3/10 of a mile travelling at a speed of 68 miles per hour in a 65 miles per hour zone. Tr. 23.[7]

10.     Before effecting the stop, Trooper Stepanski testified that he observed a bar code in the lower left-hand corner of the Defendant's vehicle. Tr. 23. This bar code indicated to Trooper Stepanski that the vehicle was a rental. Tr. 23. He ran the vehicle registration through Pennsylvania's Commonwealth Law Enforcement Assistance Network (CLEAN) and the National Crime Information Center (NCIC) system which revealed that the vehicle was owned by Enterprise Rental. Tr. 23-24.

11.     While following Defendant, Trooper Stepanski observed Defendant, while passing another vehicle, merge in too closely behind a maroon pickup truck. Gov't Ex. 2, Tr. 24.

---

[7]      According to a "Certificate of Speedometer Accuracy, Trooper Stepanski's patrol vehicle was tested for accuracy on July 16, 2018. Tr. 77, Def. Ex. 2. When tested, the patrol vehicle's speedometer measured  speed one or two miles per hour faster than the true speed of the vehicle—*e.g.*, if the vehicle was traveling 60 miles per hour, the speedometer indicated that it was traveling 61 miles per hour. Between 60 miles per hour and 70 miles per hour the difference between what the speedometer indicated, and the true speed was increased to two miles per hour.

This caught his attention because had the pickup truck stopped abruptly, the distance at which Defendant followed could result in a crash. Tr. 24.

12.     Trooper Stepanski further observed Defendant catch up with a large commercial vehicle. Gov't Ex. 2, Tr. 25. As Defendant drove behind the commercial vehicle, Trooper Stepanski observed Defendant following it at such a distance that Defendant would not be able to see around it. Gov't Ex. 2, Tr. 25.

13.     After clocking Defendant's vehicle travel above the speed limit for 3/10 of a mile and observing Defendant follow the large commercial vehicle too closely, Trooper Stepanski activated his overhead emergency lights to effectuate a traffic stop. Gov't Ex. 2, Tr. 28-29.[8]

14.     Defendant pulled over to the right shoulder near mile marker 72, Northampton County in Williams Township. Gov't Ex. 2, Tr. 29, 90-92. Trooper Stepanski parked his patrol vehicle behind Defendant's vehicle. Gov't Ex. 2.

15.     After pulling Defendant over, Trooper Stepanski approached the passenger side of the vehicle. Gov't Ex. 2, Tr. 29.

16.     Trooper Stepanski testified that as he approached, Defendant was waiting with his arm extended out into the passenger seat area and had his license in hand ready to pass to the trooper. Tr. 30. Although Defendant had his license out, Trooper Stepanski did not immediately take it. Tr. 29-30.

---

[8]     As he followed Defendant, there were other vehicles that passed Trooper Stepanski or traveled in manners that might constitute motor vehicle violations. Gov't Ex. 2, Tr. 84-87. Trooper Stepanski testified, however, that per PSP protocol, once he identifies a vehicle for whatever reason and begins to follow it, he is not required to deviate from the original vehicle to pay attention to another vehicle committing a traffic violation. Tr. 173.

17.     Trooper Stepanski identified himself as state police, requested Defendant's driver's license, registration, and insurance, and notified Defendant that he was being recorded by video and audio. Gov't Ex. 2, Tr. 29-31. He further explained one reason for the stop, stating that when Defendant followed too closely behind the large commercial vehicle. Gov't Ex. 2, Tr. 30.

18.     Trooper Stepanski then asked where Defendant was coming from—to which Defendant responded that he was coming from Ohio—and where Defendant was headed—to which Defendant responded that he was headed to Brooklyn, New Jersey. Gov't Ex. 2, Tr. 31-32. Trooper Stepanski clarified with Defendant that Brooklyn is in New York, not New Jersey. Gov't Ex. 2, Tr. 31-32.

19.     Trooper Stepanski asked Defendant additional questions about his travel. Gov't Ex. 2, Tr. 31-32. Trooper Stepanski asked what the purpose of his travel was, who he was visiting, and where in Brooklyn he was headed. Gov't Ex. 2, Tr. 31-32. Defendant replied that he was visiting his cousin in Brooklyn but did not have the right address. Gov't Ex. 2, Tr. 31-32.

20.     Trooper Stepanski testified that during this questioning he noticed Defendant's hand visibly shaking in a nervous manner and, at one point, Defendant dropped his elbow onto the center console to control the shaking. Tr. 30.

21.     Trooper Stepanski then asked for Defendant's license and whether the vehicle was a rental. Gov't Ex. 2, Tr. 31-32. Defendant provided his license and responded that it was a rental. Gov't Ex. 2, Tr. 31-32. The license identified Defendant and stated that he was from California. Gov't Ex. 6 (Defendant's license), Tr. 30-31.

22.     After confirming that the vehicle was a rental and learning that Defendant was from California, Trooper Stepanski then began to question Defendant more on those topics. Gov't Ex. 2, Tr. 32. He asked Defendant if he had the rental agreement with him—Defendant did not, but, at Trooper Stepanski's suggestion, reported having it on his cellphone. Gov't Ex. 2, Tr. 32.

23.     Trooper Stepanski also asked Defendant the planned length of his trip to Brooklyn, how he traveled to Ohio, and if he was visiting anyone there. Gov't Ex. 2, Tr. 31-34. Defendant informed Trooper Stepanski he was planning on staying in Brooklyn for just a couple of days, maybe two days. Gov't Ex. 2, Tr. 32. Defendant further answered that he drove from California to Ohio and was not visiting anyone there. Gov't Ex. 2. Trooper Stepanski asked Defendant's plans after Brooklyn and Defendant responded that he would then head back to Ohio. Gov't Ex. 2. When Trooper Stepanski questioned Defendant further as to why he needed to return back to Ohio, Defendant replied "just because." Gov't Ex. 2.

24.     Trooper Stepanski advised Defendant that, in addition to moving from the right lane to the left lane without leaving enough room between him and the vehicle in front, Trooper Stepanski had clocked Defendant for 3/10 of a mile travelling at a speed of 68 miles per hour in a 65 miles per hour zone. Gov't Ex. 2.

25.     Trooper Stepanski then asked Defendant more questions about the specifics of his trip. Tr. 32. Trooper Stepanski asked Defendant when he rented the vehicle and when it was due back. Gov't Ex. 2, Tr. 32-33. He also asked Defendant how he traveled from California to Ohio and why. Gov't Ex. 2, Tr. 32-33. Defendant replied that he rented the vehicle the day before in Columbus, Ohio and that it was due back the following day. Gov't Ex. 2, Tr. 32-33. He further

explained to Trooper Stepanski that he traveled to Ohio from California for work: he was a mover. Gov't Ex. 2, Tr. 32-33.

26.     When Trooper Stepanski inquired further about these facts, Defendant informed Trooper Stepanski that he had moved a customer by himself and that the moving truck was still in Ohio. Gov't Ex. 2, Tr. 32-33.

27.     Trooper Stepanski then questioned Defendant further about his destination. Gov't Ex. 2, Tr. 32-33. Defendant again told Trooper Stepanski that he was traveling to Brooklyn, did not know the address of his cousin, but had been there before and knew how to get there. Gov't Ex. 2, Tr. 32-33.

28.     As Trooper Stepanski conversed with Defendant he looked into the vehicle and noticed a large number of suitcases inside the vehicle. Tr. 32-34.

29.     Trooper Stepanski's questioning took slightly under five minutes. Gov't Ex. 2.

30.     Trooper Stepanski testified that his suspicions were raised based on Defendant's responses. Tr. 30-32. He commented on how nervous Defendant appeared and the visible shaking. Tr. 30, Gov't Ex. 2.

31.     Moreover, Trooper Stepanski was suspicious because he thought that Defendant should have had a better idea of where he was heading. Tr. 31-32.

32.     Trooper Stepanski testified that his suspicion increased on hearing that Defendant had rented a car that was due back the next day, but he planned to spend two days in Brooklyn. Tr. 32.

33.     Furthermore, the discrepancy between the six to seven suitcases he observed inside the vehicle and the length of Defendant's trip also increased Trooper Stepanski's suspicion. Tr. 32-33.

34.     Trooper Stepanski believed there was criminal activity afoot and, because of that, he wanted to search the vehicle. Tr. 34.

35.     After completing his exchange with Defendant, Trooper Stepanski returned to his vehicle, ran Defendant and the vehicle through the CLEAN and NCIC databases, and requested backup. Gov't Ex. 2, Tr. 34.

36.     Trooper Sean Ahearn arrived to serve as Trooper Stepanski's backup officer after seven- to eight-minutes. Gov't Ex. 2, Tr. 34. Trooper Stepanski directed Trooper Ahearn to stay parked behind Trooper Stepanski's vehicle so that he could seek consent from Defendant to search his vehicle. Gov't Ex. 2, Tr. 35.

37.     Trooper Stepanski then approached Defendant's vehicle, asked Defendant if he had any guns or knives on him, and asked Defendant to exit the vehicle. Gov't Ex. 2, Tr. 35. He advised Defendant to be careful as he exited the vehicle because of the interstate traffic to the left of his vehicle. Gov't Ex. 2.

38.     Initially after Defendant agreed to exit his vehicle and had exited the vehicle, he raised his arms, apparently in preparation for Trooper Stepanski to frisk him. Gov't Ex. 2.

39.     Realizing this, Trooper Stepanski communicated that he wasn't going to frisk Defendant. Gov't Ex. 2. Trooper Stepanski further told the Defendant to relax and turn around to face him. Gov't Ex. 2.

40.     Trooper Stepanski and Defendant talked off to the side of the interstate between their two vehicles. Gov't Ex. 2.

41.     Trooper Stepanski continued to ask him about his travels. Gov't Ex. 2, Tr. 35. Once again, Trooper Stepanski asked where Defendant was headed—Defendant answered Brooklyn. Gov't Ex. 2, Tr. 35. Trooper Stepanski asked who Defendant was going to see—Defendant answered his cousin Daniel, through his father's side of the family. Gov't Ex. 2, Tr. 35. Trooper Stepanski asked when the last time Defendant saw his cousin—Defendant answered like a month ago. Gov't Ex. 2, Tr. 35.

42.     Trooper Stepanski then began to ask questions about Defendant's criminal history and whether illicit materials were in the vehicle. Gov't Ex. 2, Tr. 35. Trooper Stepanski asked: (1) whether Defendant had ever been in trouble before; (2) whether he had any marijuana, cocaine, or heroin in the vehicle; (3) whether he had any large amounts of U.S. currency over $10,000 in the vehicle; (4) whether he had any untaxed cigarettes in the vehicle; (5) whether he had any stolen credit cards or fraudulent credit cards in the vehicle; and (6) whether he had any firearms in the vehicle. Gov't Ex. 2, Tr. 35-36. Defendant's response to each of these questions was no. Gov't Ex. 2, Tr. 35-36.

43.     Immediately following those questions, Trooper Stepanski asked whether he could search Defendant's vehicle.[9] Gov't Ex. 2, Tr. 36. Defendant agreed Gov't Ex. 2, Tr. 36.

---

[9]     Although defense counsel argues that Trooper Stepanski made the request to search the vehicle with his back turned to Defendant and while walking away, Def.'s Br. 6, the evidence refutes his argument. It is clear from the dash camera video and audio of the traffic stop that Trooper Stepanski made this request while standing with his body square to Defendant. Gov't Ex. 2.

44.     Trooper Stepanski then retrieved a Pennsylvania State Police "Waiver of Rights and Consent to Search" form from his patrol vehicle. Gov't Ex. 2, Tr. 36.

45.     Trooper Stepanski recited and paraphrased section 6 of the form, saying:

You've been requested by me, the Pennsylvania State Police, to give the consent for the officer to search the vehicle. I understand that I have the right to refuse this request and I may not be able to conduct the search without a search warrant. Nonetheless, I voluntarily give my consent for the police to search this vehicle.

Gov't Ex. 2.

46.     Trooper Stepanski then showed Defendant where to sign his name, print his name, and fill in his address. Gov't Ex. 2, Gov't Ex. 8, Tr. 36-37. After being handed the form, Defendant immediately did so. Gov't Ex. 2, Gov't Ex. 8, Tr. 36-37. Although Defendant was given an opportunity to read the form, it does not appear that he read the form in its entirety before signing. Gov't Ex. 2, Tr. 113-15.

47.     During this portion of the traffic stop, Trooper Stepanski and Defendant stood off to the side of the interstate between their two vehicles. Gov't Ex. 2. Trooper Ahearn remained in his vehicle. Gov't Ex. 2. Trooper Stepanski never brandished his firearm or placed Defendant in handcuffs. Gov't Ex. 2.

48.     After Defendant signed the form, Trooper Stepanski waived Trooper Ahearn over to attend to Defendant while Trooper Stepanski searched the vehicle. Gov't Ex. 2.

49.     Trooper Stepanski then conducted a search of Defendant's vehicle. Gov't Ex. 2, Tr. 37-38. Trooper Stepanski testified that because during the traffic stop the number of suitcases drew Trooper Stepanski's attention, he went straight to the passenger side of Defendant's vehicle, opened the door, and removed a suitcase. Gov't Ex. 2, Tr. 37-38.

50.     Immediately upon opening the suitcase, Trooper Stepanski observed approximately thirty sealed packages of what he believed to be heroin. Gov't Ex. 2, Tr. 37-39, Gov't Ex. 9 (photograph of the suitcase Trooper Stepanski opened).

51.     Trooper Stepanski immediately instructed Trooper Ahearn to seize Defendant. Gov't Ex. 2, Tr. 38. The Troopers then arrested Defendant, handcuffed him, and placed him in the backseat of Trooper Stepanski's patrol vehicle. Gov't Ex. 2, Tr.

52.     Slightly under twenty minutes had elapsed since the inception of the traffic stop. Gov't Ex. 2.

53.     Eventually, the vehicle was towed back to a PSP barracks to be searched and unloaded. Gov't Ex. 2, Tr. 41-44.

54.     Upon searching the vehicle, PSP located and seized 86.9 kilograms of suspected controlled substances found inside suitcases located in Defendant's vehicle. Tr. 47, Gov't Exs. 9-22 (photographs of suitcases containing suspected controlled substances).

55.     All of the seized suspected controlled substances were weighed and tested at the Drug Enforcement Administration Northeast Laboratory. Tr. 47.[10]

## III.     CONCLUSIONS OF LAW

The Fourth Amendment guarantees "against unreasonable searches and seizures." U.S. Const. amend. IV. "A traffic stop is a 'seizure' within the meaning of the Fourth Amendment,

---

[10]     The Drug Enforcement Administration Northeast Laboratory determined that there were 69 kilograms of cocaine, 14 kilograms of fentanyl, and 3.9 kilograms of acetylfentanyl seized. Tr. 47.

'even though the purpose of the stop is limited and the resulting detention quite brief.'" *United States v. Delfin-Colina*, 464 F.3d 392, 396 (3d Cir. 2006) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *United States v. Wilson*, 413 F.3d 382, 386 n.3 (3d Cir. 2005)). Routine traffic stops, analogous to investigative detentions, have been historically reviewed under the framework first articulated in *Terry v. Ohio*, 392 U.S. 1 (1968). "[A] traffic stop will be deemed a reasonable 'seizure' when an objective review of the facts shows that an officer possessed specific, articulable facts that an individual was violating a traffic law at the time of the stop." *Delfin-Colina*, 464 F.3d at 396; *see also Whren v. United States*, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."); *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006) (explaining that a traffic stop is constitutional so long as it is supported by probable cause or reasonable suspicion to believe that a traffic violation has been committed, even if the stop is a pretext for an investigation of some other crime).

As discussed above, Defendant moves to suppress all evidence obtained by the government or statements he made during the traffic stop on November 13, 2018. Suppress. Mot., ECF No. 18. Defendant's motion concentrates on four parts of the traffic stop. First, Defendant moves to suppress on the ground that Trooper Stepanski lacked reasonable suspicion to stop him for a motor vehicle violation. Second, he argues that Trooper Stepanski had no reasonable suspicion to continue to detain and question Defendant after the initial stop. Third, he argues that his *Miranda* rights were violated by his interaction with Trooper Stepanski. Finally, he argues that the consent he gave to search his vehicle is invalid.

The government filed a response to Defendant's motion to suppress evidence. Response, ECF No. 19. The government responds that Trooper Stepanski acted justly and reasonably at

each stage of his investigation. The government argues that Trooper Stepanski did not run afoul of the Fourth Amendment or the Fifth Amendment and his actions do not provide any basis for suppression. The government addressed Defendant's arguments as follows. First, the government contends that the initial stop was supported by Trooper Stepanski's observation of traffic violations. Second, the government argues that the extension of the stop was supported by reasonable suspicion developed in Trooper Stepanski's first encounter with Defendant. Third, the government argues that there was no *Miranda* violation because Defendant was not in custody and was not interrogated. Finally, the government argues that the search of the vehicle was supported by Defendant's valid consent to search. The Court considers these arguments below.

### A. Trooper Stepanski had reasonable suspicion to stop Defendant because he observed traffic violations.

First, the Court must determine whether Trooper Stepanski had reasonable suspicion to believe that a traffic violation has been committed. *See Mosley*, 454 F.3d at 252 (holding that a traffic stop is constitutional so long as it is supported by probable cause to believe that a traffic violation has been committed).[11]

---

[11] Analyzing a similar traffic stop, initiated after a state trooper observed the defendant's car cross the shoulder line, Judge Mariani of the Middle District of Pennsylvania recognized that Pennsylvania has created a "two tier" system for traffic stops. *United States v. Prado*, No. 3:15-CR-151, 2017 WL 1653957, at *3 n.2 (M.D. Pa. May 1, 2017). Under Pennsylvania law, an officer can stop a driver based on reasonable suspicion when the officer has a "legitimate expectation" that the stop will reveal additional information concerning the suspected offense; however, when the nature of the traffic offense suggests that a traffic stop will not yield additional relevant information, the officer must have probable cause. *Id.* Pennsylvania courts have placed offenses based upon crossing the shoulder line in the second category. *Id.* Regardless, federal courts do not use Pennsylvania's two-tiered approach and hold a traffic stop constitutional when the officer has a reasonable suspicion that the driver violated a provision of the traffic code. *Id.*

"It is well-established that a traffic stop is lawful under the Fourth Amendment where a police officer observes a violation of the state traffic regulations." *United States v. Moorefield*, 111 F.3d 10, 12 (3d Cir. 1997) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977)); *see also United States v. Calloway*, 571 F. App'x 131, 136 (3d Cir. 2014) (finding that a traffic stop occurring after police officers observed a vehicle drive at a high rate of speed in the oncoming lane was lawful). "[A]ny technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime." *Mosley*, 454 F.3d at 252 (citing *Whren*, 517 U.S. 806); *see also United States v. Smith*, No. 18-cv-93, 2018 U.S. Dist. LEXIS 149891, at *5 (E.D. Pa. Sep. 4, 2018) ("Therefore, [the] Officer['s] stop—even if based on the ulterior motive of finding a suspected shooter—was reasonable under the Fourth Amendment.").

Trooper Stepanski testified, and the Court finds as fact, that he stopped Defendant's vehicle because he observed the vehicle engaged in two traffic violations.[12] First, Trooper Stepanski clocked the vehicle for 3/10 of a mile, as required by the relevant Pennsylvania statute, travelling at a speed of 68 miles per hour in a 65 miles per hour zone,[13] in violation of 75 Pa.

---

[12] Trooper Stepanski's testified that he observed Defendant merge in too closely behind a maroon pickup truck. Although this conduct appears to violate other Pennsylvania traffic statutes, *see*, *e.g.*, 75 Pa. Cons. Stat. §§ 3303, 3304, 3305, Trooper Stepanski did not identify this violation as a reason for the traffic stop.

[13] Defendant insinuates that the discrepancy between Trooper Stepanski's patrol vehicle's true speed and the speed indicated by the speedometer (*see supra* note 7) undermines Trooper Stepanski's justification for the traffic stop. Def.'s Br. 12-13. Notwithstanding the fact that Trooper Stepanski observed an additional traffic violation which would justify a traffic stop and even assuming that the speedometer overestimated the speed by a mile or two per hour, the Court finds that Defendant still exceeded the speed limit. *Mosley*, 454 F.3d at 252 ("[A]ny technical violation of a traffic code legitimizes a stop."); *see also United States v. Green*, 897 F.3d 173, 178 (3d Cir. 2018) ("The operative question is whether [the police officer] had a reasonable suspicion that [the defendant] was speeding, not whether [the police officer] could determine [the defendant's] exact speed.")

Cons. Stat. § 3362.[14] *See United States v. Crowder*, No. 4:17-cr-00291, 2019 U.S. Dist. LEXIS

31970, at *8 (M.D. Pa. Feb. 28, 2019) (finding reasonable suspicion for a legitimate traffic stop

based on officers' testimony that they clocked defendant's vehicle travelling at a rate of speed of

seventy-two miles per hour in a zone posted with a sixty-five mile per hour speed limit). Second,

Trooper Stepanski observed Defendant following a large commercial vehicle at such a distance

that Defendant would not be able to see around it. This is in violation of 75 Pa. Cons. Stat.

§ 3310.[15] *See United States v. Terry*, No. 3:18-cr-24, 2019 U.S. Dist. LEXIS 84273, at *31

(W.D. Pa. May 20, 2019) (finding reasonable suspicion of a traffic violation based on section

3310 where an officer observed a motor vehicle following the car in front of it too closely).

---

[14]      The relevant portion of section 3362, maximum speed limits, provides:

> a) General rule. — Except when a special hazard exists that requires lower speed for compliance with section 3361 (relating to driving vehicle at safe speed), the limits specified in this section or established under this subchapter shall be maximum lawful speeds and no person shall drive a vehicle at a speed in excess of the following maximum limits:
>
> . . . .
>
> (1.1) 65 miles per hour or 70 miles per hour for all vehicles on freeways where the department has posted a 65- miles-per-hour or 70-miles-per-hour speed limit.

75 Pa. Cons. Stat. § 3362.

[15]      The relevant portions of section 3310, following too closely, provide:

> (a) General rule. — The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the highway.
>
> (b) Combinations of vehicles and trucks. — The driver of any motor vehicle drawing another vehicle or of any truck when traveling upon a roadway outside of an urban district and following a motor vehicle drawing another vehicle or following a truck shall, whenever conditions permit, leave sufficient space so that an overtaking vehicle may enter and occupy the space without danger, except that this subsection does not prevent a motor vehicle drawing another vehicle or prevent a truck from overtaking and passing any vehicle or combination of vehicles.

75 Pa. Cons. Stat. § 3310

Based on these facts, Trooper Stepanski had reasonable suspicion to initiate a traffic stop of Defendant's vehicle.

**B. Trooper Stepanski's initial inquiries qualify as ordinarily incident to the stop's mission and he had reasonable suspicion to extend the traffic stop.**

After finding that the traffic stop was lawful, the Court must determine next whether Trooper Stepanski's behavior during the stop unreasonably infringed on Defendant's constitutionally protected interests. *See Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

"Once an officer lawfully stops a vehicle, he may detain the driver until he completes the investigation of the possible violation." *United States v. Garcia-Vasquez*, No. 17-cv-315, 2017 U.S. Dist. LEXIS 202047, at *9 (E.D. Pa. Dec. 5, 2017) (citing *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)). "A stop becomes unlawful when it lasts longer than is necessary to complete its mission, the rationale being that the authority for the seizure ends when tasks tied to the mission are, or reasonably should have been, completed." *United States v. Clark*, 902 F.3d 404, 410 (3d Cir. 2018) (internal quotation marks and alterations omitted) (citing *Rodriguez v. United States*, 135 S. Ct. 1609, 1616 (2015)). To prolong a stop beyond the point that is necessary to complete its mission, "the officer must have acquired reasonable suspicion during the mission to justify further investigation." *Clark*, 902 F.3d at 410; *see also United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003) ("After a traffic stop that was justified at its inception, an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation.").

Because Defendant broadly attacks all stages of the stop, the Court divides this portion of the traffic stop where Trooper Stepanski made initial inquiries and decided to call for backup

into two subsections: (1) initial questions related to the stop's mission; and (2) Trooper Stepanski's decision to call for backup.

### 1. Initial questions related to the stop's mission

Defendant challenges whether Trooper Stepanski's questioning about the ownership of the vehicle, his itinerary, and other background questions qualify as ordinarily incident to the stop's mission. Defendant argues that "[t]he unnecessary and highly personal questions Trooper Stepanski used to increase suspicion unlawfully increased the duration of the stop." Def.'s Br. 15.

"Not all inquiries during a traffic stop qualify as ordinarily incident to the stop's mission." *Clark*, 902 F.3d at 410. Investigations into other crimes and safety precautions taken to facilitate such investigations do not qualify as ordinarily incident to the stop. *Id.* (citing *Rodriguez*, 135 S. Ct. at 1615). Still, the United States Court of Appeals for the Third Circuit has consistently found routine questions about vehicle ownership, a motorist's itinerary, and other background questions to qualify as ordinary inquiries incident to a traffic stop. *See e.g.*, *United States v. Caraballo*, 104 F. App'x 820, 822 (3d Cir. 2004) (finding that it was reasonable for an officer to inquire about the ownership and use of a vehicle when provided with a license from one state and registration from another); *Givan*, 320 F.3d at 459 ("[Q]uestions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop."). This approach is consistent with the approaches of various other circuit courts around the country.[16]

---

[16]     *See, e.g.*, *United States v. Meko*, 912 F.3d 1340, 1354 (11th Cir. 2019) ("Generally, questions about travel plans are ordinary inquiries incident to a traffic stop."); *United States v. Dion*, 859 F.3d 114, 125 (1st Cir. 2017) ("Our case law allows an officer carrying out a routine traffic stop to request identification from the driver and to inquire into the driver's itinerary."); *United States v. Englehart*, 811 F.3d 1034, 1040 (8th Cir. 2016) (explaining that an officer may detain an offending motorist to complete a number of routine tasks related to the traffic violation

Here, Trooper Stepanski asked Defendant about the ownership of the vehicle, his itinerary, and other related background questions. These questions are all within the realm of ordinary inquiries. As such, this Court finds Trooper Stepanski's questions were permissible, ordinary inquires incident to a traffic stop. Trooper Stepanski did not need additional reasonable suspicion because he did not extend the traffic stop up to this point.

## 2. Trooper Stepanski's decision to call for backup

The Court next considers whether Trooper Stepanski's extension of the traffic stop was appropriate. To determine the permissibility of Trooper Stepanski's extension of the traffic stop, the Court looks to the United States Court of Appeals for the Third Circuit's decision in *United States v. Green*. 897 F.3d 173 (3d Cir. 2018). In *Green,* the United States Court of Appeals for the Third Circuit referenced the Supreme Court of the United States' decision in *Rodriguez* and directed courts to "first determine when [a traffic] stop was measurably extended." *Green*, 897 F.3d at 179 (citation and quotations omitted). Then, after determining when the stop was measurably extended, the "*Rodriguez* moment," a court must assess whether the facts available

---

including questions about the motorist's itinerary); *United States v. Spears*, 636 F. App'x 893, 901 (5th Cir. 2016) (stating that the time reasonably required to complete the mission of issuing a traffic ticket can consist of certain tasks including inspecting automobile registration and asking the purpose and itinerary of the trip); *United States v. Pena-Gonzalez*, 618 F. App'x 195, 197-98 (5th Cir. 2015) (maintaining that inquiries related to a driver's itinerary are related to the "mission" of the traffic stop); *United States v. Bowman*, 660 F.3d 338, 343 (8th Cir. 2011) (stating that during a traffic stop an officer may detain the occupants of the vehicle to complete a number of routine tasks including asking for the driver's license, the vehicle's registration, as well as inquiring about the occupants' destination, route, and purpose); *United States v. Brigham*, 382 F.3d 500, 508 (5th Cir. 2004) ("An officer may also ask about the purpose and itinerary of a driver's trip during the traffic stop"); *United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001)( "When directly confronted with the issue, we have repeatedly held (as have other circuits) that questions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop.").

to an officer at that time were sufficient to establish reasonable suspicion. *Green*, 897 F.3d at 179.

As the United States Court of Appeals for the Third Circuit described in *Green*, pinpointing the "*Rodriguez* moment" is difficult. *Id.* at 179. This difficulty is muddled because Defendant does not clearly articulate the moment he believed the purpose of the traffic stop was completed and it was extended. *See* Def.'s Br. 13-15. The government, on the other hand, appears to argue that the stop was extended beyond its initial purpose only after Trooper Ahearn arrived as backup and Trooper Stepanski began to question Defendant further. Gov't Proposed Find. Fact & Concl. Law 14 ¶ 12, ECF No. 30 [hereinafter Gov't Br.]. Erring on the side of caution, the Court assumes the earliest of the plausible moments: when Trooper Stepanski returned to his vehicle after the initial inquiries ordinarily incident to the stop's mission, ran Defendant and the vehicle through law enforcement databases, and requested backup. At this point, instead of completing the traffic stop and issuing a citation or warning for the traffic violations he observed, Trooper Stepanski extended the stop by calling for backup and waiting for it to arrive.[17] *See Rodriguez*, 135 S. Ct. at 1614 ("Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.").

Having identified this moment—when Trooper Stepanski returned to his car and decided to wait for backup to arrive—as the earliest possible *Rodriguez* moment, the Court must now determine whether the facts known to Trooper Stepanski at this moment were sufficient to

---

[17]  Indeed, this decision to err on the side of caution is supported by Trooper Stepanski's testimony. At the suppression hearing, Trooper Stepanski testified that, he immediately called for backup because he "knew [he] wanted to search the vehicle." Tr. 34. Moreover, the series of questions Trooper Stepanski asked Defendant after backup arrived and Defendant stepped out of his car were inquiries about drug trafficking and other crimes; not the stop's traffic-based purpose. *See generally Rodriguez*, 135 S. Ct. 1609.

establish reasonable suspicion that criminal activity was afoot and to justify extending the stop. *See Green*, 897 F.3d at 179 ("After determining when the stop was extended—the '*Rodriguez* moment,' so to speak—we can assess whether the facts available to [the officer] at that time were sufficient to establish reasonable suspicion that [the defendant] was involved in drug trafficking.").

Reasonable suspicion is an "elusive concept." *United States v. Cortez*, 449 U.S. 411, 417 (1981). In *United States v. Green*, citing various precedent, the United States Court of Appeals for the Third Circuit described it as "more than a mere hunch but considerably less than a preponderance of the evidence, and obviously less than probable cause." 897 F.3d at 183 (citations and quotations omitted). Reasonable suspicion "requires only a particularized and objective basis for suspecting criminal activity and should not be derived from characteristics common to the vast majority of innocent individuals." *Id.* at 183 (citations and quotations omitted). "This suspicion must be based in an 'objective justification' and not simply 'an unparticularized suspicion or hunch.'" *United States v. Harrison*, No. 17-cv-228, 2018 U.S. Dist. LEXIS 157805, at *15 (E.D. Pa. Sep. 17, 2018) (citing *United States v. Brown*, 765 F.3d 278, 290 (3d Cir. 2014)). "Courts give considerable deference to police officers' determinations of reasonable suspicion." *Mosley*, 454 F.3d at 252.

In his testimony Trooper Stepanski described various factors he observed that he deemed suspicious: He noticed nervousness. The stop occurred in a known drug corridor. The statements Defendant gave as to his travel itinerary were inconsistent with the stated duration of his rental for his vehicle. Defendant, who was from California, stated he was visiting his cousin but did not have an accurate understanding of where he was headed. Defendant packed a large number of suitcases for such a short trip.

Other courts have found that similar officers' observations establish reasonable suspicion. For example, the United States Supreme Court explicitly recognized nervousness as a pertinent factor in determining reasonable suspicion. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."); *see also United States v. Broadus*, 291 F. App'x 486, 489 (3d Cir. 2008) (explaining that an individual's nervousness, while insufficient alone, is a pertinent factor in evaluating whether reasonable suspicion exists); *United States v. West*, 103 F. App'x 460, 462 (3d Cir. 2004) ("While [nervous] behavior clearly is relevant in the assessment of whether there was reasonable suspicion, it is not necessarily enough, standing alone."). Confusing or somewhat contradictory statements as to an individual's itinerary also "may contribute to reasonable suspicion." *Green*, 897 F.3d at 185; *see also United States v. Ramdihall*, 859 F.3d 80, 93 (1st Cir. 2017) (reasoning that an odd explanation of travel plans and the strange fact that the rental car's expiration fell in the middle of the supposed trip supported a finding of reasonable suspicion); *United States v. Dion*, 859 F.3d 114, 125-26 (1st Cir. 2017) (concluding that an "odd answer to a concededly appropriate question about travel itinerary both prompted and warranted [a police officer's] follow-up questions in the cruiser on that subject" and supported a finding of reasonable suspicion); *United States v. Kitchell*, 653 F.3d 1206, 1219 (10th Cir. 2011) ("The motorist's or his passengers' inconsistent statements in response to such questions can give rise to reasonable suspicion of criminal activity."). A finding of reasonable suspicion may also be supported by an officer's observation of an unusual amount of luggage in the stopped vehicle. *See United States v. Thompson*, 772 F.3d 752, 760 (3d Cir. 2014) (finding that an inconsistency between the amount of luggage and the stated length of the trip was one of several factors to pique an officer's suspicion and that it was reasonable for the officer to infer that the defendant

was engaged in illegal activity); *United States v. Jones*, 44 F.3d 860, 872 (10th Cir. 1995) (lack of luggage for an alleged two-week trip combined with other factors provided reasonable suspicion). Some courts have also considered presence in a drug corridor as a factor in evaluating reasonable suspicion. *See, e.g.*, *United States v. Williams*, 808 F.3d 238, 248 (4th Cir. 2015) ("[A]lthough we have recognized that law enforcement officers and the trial courts are entitled to consider a motorist's use of an interstate highway as a factor in determining reasonable suspicion, we are entirely satisfied that such an observation, standing alone, is entitled to very little weight."); *Thompson*, 772 F.3d at 760 (finding that a defendant's travel along a known drug corridor was one of several factors to support finding reasonable suspicion); *but see United States v. Simpson*, 609 F.3d 1140, 1152 n.3 (10th Cir. 2010) ("We also give no credence to [the officer's] testimony that [the defendant] was traveling on a major 'drug corridor.'"); *United States v. Boyce*, 351 F.3d 1102, 1109 (11th Cir. 2003) (determining that "driving a rental car on a widely used interstate that also happens to be a known drug corridor, does not create a reasonable suspicion").

In arguing that Trooper Stepanski did not have reasonable suspicion, Defendant invites the Court to view each of the suspicious factors Trooper Stepanski described in a vacuum. He suggests plausible, innocent explanations or challenges Trooper Stepanski's assessments for each factor presented. Def.'s Br. 15. However, this method of interpretation is not sufficient to discredit the inferences Trooper Stepanski reached based on his reasoning and observations. *See Green*, 897 F.3d at 183 (citing *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)) ("[R]easonable suspicion cannot be defeated by a so-called "divide-and-conquer" analysis, whereby each arguably suspicious factor is viewed in isolation and plausible, innocent explanations are offered for each.").

Here, the totality of the circumstances indicate Trooper Stepanski developed objective, reasonable suspicion necessary to extend the stop for seven to eight minutes until backup arrived. The Court reaches this conclusion based on the factors—taken together—Trooper Stepanski observed: Defendant's nervousness; the nature and location of Defendant's travels; the inconsistencies of Defendant's travel itinerary, the lack of understanding of his destination, and his explanations of those inconsistencies; and Defendant's excess luggage for a trip of such short duration. These observations, taken together and viewed in light of Trooper Stepanski's experience and training, constituted reasonable suspicion of criminal activity that justified extending the stop and making further inquiries.

**C. Trooper Stepanski did not need to give Defendant *Miranda* warnings because Defendant was not being subjected to a custodial interrogation and Trooper Stepanski's search of Defendant's vehicle was reasonable because Defendant gave his consent.**

Defendant seeks to exclude his verbal consent for Trooper Stepanski to search his vehicle. He uses two different, overlapping rationales to support his argument to exclude his consent. First, Defendant seeks to exclude any statement he made and the consent he gave to Officer Stepanski on the grounds that consent was elicited from him in violation of his Fifth Amendment rights. Second, he argues that he did not give consent to search the vehicle freely and voluntarily. The Court addresses each in turn.

**1. Fifth Amendment argument**

Defendant seeks to exclude any statement he made and the consent he gave to Officer Stepanski on the grounds that they were elicited from him in violation of his Fifth Amendment rights. The government counters that the statements should not be suppressed because Defendant was not subject to a custodial interrogation.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court created a right based on the Fifth Amendment of the United States Constitution that a defendant must be advised of certain rights before being subjected to a custodial interrogation. *Id.* at 467-68. Absent a "custodial interrogation"—"questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way"—no *Miranda* warnings are required. *Id.* at 444; *see also Thompson v. Keohane*, 516 U.S. 99, 107 (1995). "If *Miranda* warnings are not given before a person 'in custody' is questioned, evidence resulting from the questioning must be suppressed." *United States v. Jacobs*, 431 F.3d 99, 104 (3d Cir. 2005) (citing *Miranda*, 384 U.S. at 444-45).

"A person is in custody if, given the circumstances surrounding the interrogation, a reasonable person would not have felt free to terminate the interrogation and leave." *United States v. Savage*, 677 F. Supp. 2d 756, 763 (E.D. Pa. 2009) (citing *Jacobs*, 431 F.3d at 105). In determining whether a person was in custody, courts consider a variety of factors, including:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

*United States v. Willaman*, 437 F.3d 354, 359-60 (3d Cir. 2006).

In the context of traffic stops, the Supreme Court has also stated that "the roadside questioning of a motorist who was pulled over in a routine traffic stop did not constitute custodial interrogation." *Howes v. Fields*, 565 U.S. 499, 509-10 (2012) (citing *Berkemer v. McCarty*, 468 U.S. 420, 423, 441-42 (1984)). Commenting on its previous decision in *Berkemer*, the Supreme Court in *Howes* explained that although a motorist would not necessarily feel free to disobey a directive to pull over or leave the scene of a traffic stop without being told they

might do so, that a detained motorist is "not in *Miranda* custody because such detention does not 'sufficiently impair [the detained person's] free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights.'" *Howes*, 565 U.S. at 510 (quoting *Berkemer*, 468 U.S. at 422 (alterations in original)); *see also Maryland v. Shatzer*, 559 U.S. 98, 113 (2010) ("Thus, the temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody." (citations omitted)); *United States v. Anderson*, 859 F.2d 1171, 1177 (3d Cir. 1988) ("[T]he roadside questioning of a motorist detained pursuant to a routine traffic stop is not custodial in nature and *Miranda* warnings are not required."). Furthermore, a police officer may order a motorist to exit the vehicle after a traffic violation. *See United States v. Kithcart*, 134 F.3d 529, 535 (3d Cir. 1998) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977)); *see also United States v. Burton*, 532 F. App'x 171, 174 (3d Cir. 2013).

As discussed above, Trooper Stepanski's observations, taken together and viewed in light of Trooper Stepanski's experience and training, constituted reasonable suspicion of criminal activity that justified extending the stop and making further inquiries. Once backup arrived, Trooper Stepanski asked Defendant to exit his vehicle. After Defendant agreed and had exited his vehicle, Trooper Stepanski continued to question him about his travels. During this questioning, there is no indication that Defendant was in custody for *Miranda* purposes. Trooper Stepanski never advised Defendant that he was under arrest, he did not interact with Defendant in a hostile or coercive manner or display his weapon at any point, and he did not handcuff or restrain Defendant in any manner.[18] Furthermore, when Defendant exited the vehicle, Trooper

---

[18]    Only after Trooper Stepanski received consent, searched Defendant's vehicle, and obtained probable cause to arrest did he place Defendant under arrest. Gov't Ex. 2, Tr. 38-39. Trooper Stepanski gave Defendant the *Miranda* warnings immediately after placing him under

Stepanski actively tried to relax Defendant and communicated that he did not ask the Defendant out of his car to frisk him. During this period, Trooper Ahern remained in his patrol vehicle behind Trooper Stepanski's patrol vehicle. Because Defendant was not taken into custody or otherwise deprived of his freedom of action in any significant way, there was no custodial interrogation. Accordingly, no *Miranda* warnings were required while Trooper Stepanski questioned Defendant further, requested consent, or searched the vehicle after receiving consent.

### 2. Consent argument

As explained above, the Fourth Amendment guarantees "against unreasonable searches and seizures." U.S. Const. amend. IV. The previous portions of this opinion considered the prohibition on unreasonable seizures. Now, the Court turns to the prohibition on unreasonable searches.

During the traffic stop Defendant gave consent, verbally and in writing, for Trooper Stepanski to search his vehicle. However, Defendant moves to suppress the fruits of this search on the grounds that the alleged violations discussed above are not curable by his consent to the search of his vehicle. In essence, Defendant argues that if the traffic stop, extension of the stop, and roadside questioning without *Miranda* warnings are in violation of the Fourth or Fifth

---

arrest. Gov't Ex. 2, Tr. 38-39. The Court notes that Defendant does not challenge that Trooper Stepanski gave Defendant adequate *Miranda* warnings or that he cooperated with the police officers following his arrest. Tr. 12-14. Instead, Defendant's argument is that all statements beyond the scope of the traffic stop, all statements made during the extension of the stop, or both were made in violation of Defendant's Fifth Amendment rights.

Amendments, the consent given would be tainted and thus invalid.[19] Defendant contends further that even if he gave his consent to search the vehicle, he did not give it freely and voluntarily.[20]

A search conducted without a warrant is *per se* unreasonable, "subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 373 (1967)). A search conducted with valid consent is one "established exception." *United States v. Williams*, 898 F.3d 323, 329 (3d Cir. 2018) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). "The Supreme Court has 'long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so.'" *United States v. Price*, 558 F.3d 270, 277 (3d Cir. 2009) (quoting *Florida v. Jimeno*, 500 U.S. 248, 250-51 (1991)). Where the government seeks to rely on a search conducted pursuant to consent, the burden is on the government to

---

[19]     This piece of Defendant's argument fails. As the Court analyzed and concluded above, up to this point there have been no violations of the Fourth or Fifth Amendments.

[20]     In his suppression motion, Defendant also argued for suppression on the ground that he could not consent because of his limited ability to speak English with great accuracy. Suppress. Mot. 19. It seems that Defendant abandoned this argument as he did not mention it during the suppression hearing or in his Draft Findings of Fact and Conclusions of Law. Regardless, this argument fails as it is clear that Defendant had an adequate understanding of the English language to provide consent. *See United States v. Pejouhesh*, 603 F. App'x 347, 349 (5th Cir. 2015) ("The testimony reflects that there was sufficient conversation between [the defendant] and law enforcement agents to show that [the defendant] knew English sufficiently well to comprehend the situation. (citing *United States v. Alvarado*, 898 F.2d 987, 991 (5th Cir. 1990)). During the suppression hearing defense counsel colloquied Defendant on his understanding of English. Tr. 4-10. Defendant answered that he spoke English fluently, but he had difficulty understanding some of the formalized legal vocabulary used in court. Tr. 7-8. The Court further advised Defendant that the interpreter at the hearing was available to translate at any time. Tr. 10. Besides the initial portion of the hearing before defense counsel colloquied Defendant on his understanding of English, for the roughly four-hour hearing, no translation services were needed. Furthermore, upon review of the dash camera video and audio of the traffic stop, Gov't Ex. 2, it is clear that Defendant's consent was not the result of a misunderstanding occasioned by a language barrier, but rather knowingly given. Clearly Defendant's grasp of the English language is sufficient for a finding that consent was voluntarily given.

"prov[e] that the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968).

Whether a suspect voluntarily gave consent "is a question of fact to be determined from the totality of all of the circumstances." *Bustamonte*, 412 U.S. at 227 ("[T]he Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied."). "In assessing the voluntariness of a suspect's consent," the United States Court of Appeals for the Third Circuit has directed district courts to "consider 'the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of physical punishment.'" *Williams*, 898 F.3d at 332 (quoting *Price*, 558 F.3d at 278). The setting in which the consent was obtained, and the parties' demeanor are also relevant to a court's consideration of voluntariness. *Price*, 558 F.3d at 278 (citing *Givan*, 320 F.3d at 459); *see also United States v. Velasquez*, 885 F.2d 1076, 1082 (3d Cir. 1989) (concluding that consent given while standing on the side of a major highway in broad daylight is considered to be given freely and voluntarily).

Defendant argues that the consent he gave Trooper Stepanski was invalid because he did not give it freely and voluntarily. This argument fails. Defendant exited his vehicle willingly after Trooper Stepanski asked him to exit his vehicle and talk on the side of the road.[21] After

---

[21]     On cross examination, defense counsel questioned Trooper Stepanski on this subject. Tr. 110-112. Specifically, Trooper Stepanski was asked the following hypothetical:

> Q   So you take him out of the car. And when you say you asked him out of the car, you did say could you please, but we could all agree that he had no choice?
> A   Correct.

Defendant exited the vehicle, Trooper Stepanski clearly signaled that, at that point, he was not about to arrest Defendant and otherwise attempted to relax Defendant. Outside of their vehicles, both Trooper Stepanski and Defendant moved off to the side of the road away from passing traffic where it was safer. This portion of the traffic stop involved only Trooper Stepanski and Defendant; Trooper Ahearn remained in his vehicle. At no point did Trooper Stepanski brandish his firearm or place Defendant in handcuffs. Trooper Stepanski communicated with Defendant in a composed, assured manner but did not act in a threatening manner. This was not an unduly coercive setting and weighs in favor of a finding that the consent was voluntary. *See Garcia-Vasquez*, 2017 U.S. Dist. LEXIS 202047, at *18-19.

Moreover, Trooper Stepanski obtained both verbal and written consent before searching Defendant's vehicle. Although Trooper Stepanski did not read the Pennsylvania State Police "Waiver of Rights and Consent to Search" form to Defendant in its entirety, Trooper Stepanski summarized the essential portions of the form and informed Defendant that he had the right to refuse the request. *See Garcia-Vasquez*, 2017 U.S. Dist. LEXIS 202047, at *19 ("Indeed, although the trooper was not required to inform [the defendant] of his right to refuse consent, the fact that he did underscores the voluntary nature of [the defendant's] consent." (citing *United States v. Schettler*, 32 F. App'x 14, 15-16 (3d Cir. 2002))). Although Defendant may not have

---

Q    I mean, if he would've said no, I don't feel like getting out, you
      would've got him out, right?
A    Correct.

This line of questioning, beyond confusing the situation, does not affect the Court's analysis. *See United States v. Kithcart*, 134 F.3d 529, 535 (3d Cir. 1998) (explaining that a police officer may order a motorist to exit the vehicle after a traffic violation) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977)). Moreover, Trooper Stepanski did not need to order Defendant out of the car because Trooper Stepanski gave Defendant the option to get out voluntarily, and he willing did.

read the form in its entirety, he never indicated that he did not understand what had been read to him, what form was handed to him, or what he was signing. For all these reasons, the Court finds Defendant's consent was, freely and voluntarily given. Trooper Stepanski's search of Defendant's vehicle therefore was reasonable.

### D. Defendant has failed to prove a prima facie case for selective enforcement under the Fourteenth Amendment.

Originally Defendant moved to suppress only on the four grounds considered above. During the suppression hearing and in his Draft Findings of Fact and Conclusions of Law, Defendant also argued that Trooper Stepanski took into consideration Defendant's race when making the determination to stop the vehicle. *See* Def.'s Br. 16-19; Tr. 115-59, 179-81. In support of this argument Defendant cites, without explanation, *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973), *United States v. Luna*, 76 F. App'x 411 (3d Cir. 2003), and *Brown v. Illinois*, 422 U.S. 590 (1975). *See* Def.'s Br. 16-19. Defendant does not explain how these cases relate to his argument, nor can the Court infer how they might relate as none reference racially motivated police actions. Beyond single citations to those cases, Defendant's analysis concerning the alleged racial motivation for the stop lacks any discussion of how his allegations, if true, make the stop unreasonable under the Fourth Amendment or unlawful under any other provision of the Constitution. He focuses his discussion substantially on the facts and concludes, without analysis, that there were clear constitutional violations. In sum, Defendant's argument is unclear.

The government interpreted Defendant's argument to assert a selective enforcement claim based on his race in violation of the Equal Protection Clause of the Fourteenth Amendment.[22] The Court agrees. This appears to be Defendant's argument—that all evidence

---

[22] At the suppression hearing, the government noted that the proper constitutional basis for objecting to selective enforcement of laws is the Equal Protection Clause of the Fourteenth

obtained against him should be suppressed because of Trooper Stepanski's selective enforcement of the law based on Defendant's race or ethnicity. Specifically, Defendant appears to allege in his Draft Findings of Fact and Conclusions of Law that Trooper Stepanski decided to stop Defendant's vehicle and seek consent to search based on his race or ethnicity.

That the traffic stop, extension of the stop, roadside questioning, and consent to search were all constitutionally permissible does not resolve the claim that Defendant was targeted on account of his race. *Bradley v. United States*, 299 F.3d 197, 205 (3d Cir. 2002); *see also United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997) ("The Equal Protection Clause of the Fourteenth Amendment provides citizens a degree of protection independent of the Fourth Amendment protection against unreasonable searches and seizures."). A claim for racially or ethnically selective law enforcement requires: (1) evidence that the government actor was motivated by a discriminatory purpose and (2) that the government actor's conduct had a discriminatory effect. *Bradley*, 299 F.3d at 205 (citing *Washington v. Davis*, 426 U.S. 229, 238-42 (1976); *Chavez v. Ill. State Police*, 251 F.3d 612, 635-36 (7th Cir. 2001)); *see also Carrasca v. Pomeroy*, 313 F.3d 828, 834 (3d Cir. 2002). Once a showing of these elements is made, the burden shifts to the government to articulate a legitimate, nondiscriminatory reason for the difference in treatment. *Stewart v. Rutgers, State Univ.*, 120 F.3d 426, 432 (3d Cir. 1997). The party asserting an Equal Protection claim then must rebut that reason as pretextual. *Id.*

---

Amendment, not the Fourth or Fifth Amendments. Tr. 183. This is correct. *See Whren*, 517 U.S. at 813 ("[T]he constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). Although Defendant moves for suppression under the Fourth and Fifth Amendments, in an abundance of caution, this Court considers his selective enforcement argument.

The first element, a discriminatory purpose or intent, "implies more than intent as volition or intent as awareness of consequences." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). "It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Mass.*, 442 U.S. at 279. As to the second element, Defendant may prove discriminatory effect by showing "similarly situated members of an unprotected class [ ] were not selected for the same search or, in some cases, by submitting statistical evidence of bias." *Bradley*, 299 F.3d at 206 (quoting *Chavez*, 251 F.3d at 636).

The first portion of Defendant's argument (as the Court and the government presumed it)—that Trooper Stepanski decided to stop Defendant's vehicle based on his race or ethnicity—fails at the outset. None of the testimony or evidence offered suggests that Trooper Stepanski knew Defendant's race or ethnicity at the time leading up to the traffic stop. In fact, the undisputed testimony of Trooper Stepanski, which this Court has found to be credible, was that he could not see that Defendant was Hispanic as he drove by and before he pulled out into the median to follow his vehicle. No contrary testimony was offered. Therefore, this portion of Defendant's argument fails.

As to the second portion of Defendant's argument (as presumed), at the suppression hearing, Defendant offered a minimal amount of statistical evidence of alleged bias in the circumstances where Trooper Stepanski sought consent to search from motorists he stopped. *See* Def. Ex. 4 (tabulation of certain of Trooper Stepanski's traffic stops); Gov't Ex. 27 (same); Def. Ex. 6 (certain data of the relevant areas produced by the United States Census Bureau). The statistical evidence from the Census Bureau catalogues the racial demographics of the population for Pennsylvania and its counties. Def. Ex. 6. The statistical evidence of certain of Trooper

Stepanski's traffic stops specifically tabulated (1) reports, citations, and warnings issued by Trooper Stepanski in the twelve-month period prior to November 13, 2018, for speeding violations between zero and five miles per hour over the limit (75 Pa. Cons. Stat. § 3362) and following too closely violations (75 Pa. Cons. Stat. § 3310), and (2) all police reports and citations by Trooper Stepanski in the twelve-month period prior to November 13, 2018, where he requested consent to search. Def. Ex. 4, at 2 (Defense's subpoena served on the Pennsylvania State Police). The evidence revealed that during this period and within the constraints of the subpoenaed documents, Trooper Stepanski made 89 traffic stops. Gov't Ex. 27. Of those 89 traffic stops, he requested consent to search the vehicles 44 times. Def. Ex. 4; Gov't Ex. 27. Almost all of those involved minority (African American, Hispanic, or Asian) motorists. Def. Ex. 4; Gov't Ex. 27. Defendant also used the census data introduced to allege further that Trooper Stepanski's traffic stops were racially motivated. On superficial review, this evidence appears incriminating. But, after detailed consideration, it is clear that the evidence is not conclusive because of its incompleteness.

The records provided to the Court are incomplete for several reasons. First, the statistical evidence introduced includes only results to the subpoena for traffic stops where the motorist was traveling zero to five miles per hour over the limit or following another vehicle too closely. This ignores other stops that Trooper Stepanski made where the motorist might have been traveling at a speed higher than five miles per hour over the limit or was operating his or her vehicle in a manner that violated any other traffic statute. Second, detailed information as to the race, ethnicity, indicators, or age is only provided where Trooper Stepanski requested consent to search. For the other 45 traffic stops, there is no information as to those factors. These limitations might have misrepresented the percentage of minorities stopped, asked for consent to search, or

both. Third, the usefulness of the statistics assumes that Trooper Stepanski was unjustified in asking for consent or should have asked for consent in other circumstances. Fourth, the census data Defendant introduced only shows the racial demographics of Pennsylvania and its counties; Defendant offers no rationale for how the Court can infer from this information that Trooper Stepanski treated a targeted class of persons differently. Ultimately, these limitations prevent the Court from making any determination as to how similarly situated members of an unprotected class were not selected for the same search. *See United States v. Whitfield*, 29 F. Supp. 3d 503, 515 (E.D. Pa. 2014) ("It is not enough to show the racial composition of the individuals targeted by law enforcement; rather, the statistics must compare the racial composition of those targeted to some appropriate benchmark." (citing *United States v. Bass*, 536 U.S. 862, 864 (2002))). The Court cannot make a finding of discriminatory effect based on this information alone. To conclude, the statistical evidence offered is insufficient and does not allow for the Court to find that Trooper Stepanski made traffic stops or asked for consent to search motorists' vehicles based on an alleged bias.

Even assuming that the Court could make a finding of discriminatory effect based that evidence, Defendant fails to present evidence that Trooper Stepanski was motivated by a discriminatory purpose. During his testimony, Trooper Stepanski articulated several race-neutral reasons for deciding when to ask for consent to search a vehicle. Tr. 56-67. Moreover, the audio of the traffic stop does not indicate Trooper Stepanski operated with any discriminatory intent. Gov't Ex. 2.

Without evidence of a discriminatory intent or sufficient statistical evidence for the Court to infer a discriminatory effect, Defendant has failed to prove a prima facie case of racially selective law enforcement.

## IV.    CONCLUSION

In sum, Trooper Stepanski had reasonable suspicion to stop Defendant's vehicle for a traffic stop. During the initial stop, Trooper Stepanski developed articulable and reasonable suspicion to believe that that there was criminal activity afoot. Trooper Stepanski then reasonably extended the duration of the traffic stop. During the extended stop, Defendant provided valid consent to search the vehicle. At this point, no *Miranda* warning was required because Defendant was not subjected to a custodial interrogation. Moreover, Defendant failed to prove a prima facie case of racially selective law enforcement. For those reasons discussed herein, Defendant's motion to suppress is denied. A separate order follows.

BY THE COURT:


*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge